# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

The Travelers Property Casualty
Company of America and Hellmuth
Obata & Kassabaum, Inc.,

                Plaintiffs,

      v.

Saint-Gobain Technical Fabrics
Canada Limited, formerly known as
Bay Mills,

                Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 04-4386 ADM/AJB

_____

John Cardinal Parks, Esq., McElroy, Deutsch, Mulvaney, & Carpenter, LLP, Denver, CO, and
Michael R. Peterson, Esq., Bruce P. Candlin & Associates, St. Paul, MN, argued on behalf of
Plaintiffs.

David M. Dahlmeier, Esq. and Amy M. Coniaris, Esq., Foley & Mansfield, P.L.L.P.,
Minneapolis, MN, argued on behalf of Defendant.

_____

## I. INTRODUCTION

On October 31, 2006, oral argument before the undersigned United States District Judge

was heard on Defendant Saint-Gobain Technical Fabrics Canada Limited's ("Saint-Gobain")

Motion for Summary Judgment [Docket No. 20] and Plaintiffs The Travelers Property Casualty

Company of America ("Travelers") and Hellmuth Obata & Kassabaum, Inc.'s ("HOK")

(collectively, "Plaintiffs") Motion for Partial Summary Judgment [Docket No. 25]. In their

Complaint [Docket No. 1], Plaintiffs assert claims that Saint-Gobain is liable for damage to the

exterior of the Pepsi Center Arena ("Pepsi Center") in Denver, Colorado. Additionally, Saint-

Gobain has filed a Motion to Strike [Docket No. 68], and Plaintiffs have filed an Objection to

Magistrate Judge's Order on Motion for Leave to File Amended Complaint [Docket No. 64] and

an Objection to Magistrate Judge's Order on Motion for Extension of Deadline [Docket No. 88]. For the reasons set forth herein, Saint-Gobain's Motion for Summary Judgment is granted in part and denied in part, Saint-Gobain's Motion to Strike is denied as moot, Plaintiffs' Motion for Partial Summary Judgment is denied, and both of Plaintiffs' Objections, construed as appeals, are denied.

## II. BACKGROUND

### A.     Construction of the Pepsi Center's Exterior Walls

The Pepsi Center, located in Denver, Colorado, is a multi-purpose arena for professional and amateur sporting events, concerts, conventions, and other public and private functions. Compl. ¶ 5.  The Pepsi Center is owned by Kroenke Arena Company, LLC ("Kroenke"), a Colorado company.  Id.; 09/15/06 Parks Decl. [Docket No. 28] Ex. 1 at 1.  On November 20, 1997, Kroenke and HOK entered into a contract for HOK to provide design-related services for the construction of the Pepsi Center.  09/15/06 Parks Decl. Ex. 1 at 1.  On November 27, 1997, Kroenke and M.A. Mortenson Company ("Mortenson"), a Minnesota corporation, entered into a contract for Mortenson to act as the general contractor for the construction of the Pepsi Center. Compl. ¶ 7; 09/15/06 Parks Decl. Ex. 1 at 1-2.  On February 12, 1998, Mortenson entered into a subcontract agreement with Denver Drywall Company ("Denver Drywall"), a Colorado corporation, for Denver Drywall to be the prime subcontractor for the construction of the Pepsi Center's exterior walls.  09/15/06 Parks Decl. Ex. 1 at 1-2.  On August 3, 1998, Denver Drywall entered into a subcontract agreement with Big Horn Plastering, Inc. and Big Horn Plastering of Colorado, Inc. (collectively, "Big Horn"), both Colorado corporations, for Big Horn to apply the exterior insulation and finish system ("EIFS") to the Pepsi Center's exterior walls.  Id.

The Pepsi Center EIFS is a multi-layered, multi-component exterior cladding consisting of, *inter alia*, a base coat applied to the face of the expanded polystyrene ("EPS") insulation board, a glass fiber reinforcing mesh embedded into the base coat, and a textured decorative finish coat consisting of synthetic polymers, pigments, and filler materials. Id. at 2. The base coat, mesh, and finish coat are collectively referred to as "lamina." Id.

The components used in the Pepsi Center EIFS were provided by TEC Specialty Products, Inc. ("TEC"), a Minnesota corporation now known as Specialty Construction Brands, Inc. Id. at 1-2. In particular, TEC's proprietary "Ful-O-Mite" EIFS was selected. Munce Dep. (Coniaris Aff. [Docket No. 45] Ex. A; 09/15/06 Dahlmeier Aff. [Docket No. 23] Ex. C) at 26. By a Purchase Order dated September 28, 1998, TEC ordered reinforcing mesh from Saint-Gobain, then known as Bay Mills, an Ontario, Canada, corporation. TEC Purchase Order (09/15/06 Parks Decl. Ex. 3 Attach. 1) at 1. The back of the Purchase Order contained TEC's general terms and conditions of purchase. Id. at 2. On October 21, 1998, Saint-Gobain shipped mesh in response to TEC's Purchase Order. Jones Dep. (09/15/06 Dahlmeier Aff. Ex. F; 09/15/06 Parks Decl. Ex. 8; 10/13/06 Parks Decl. [Docket No. 48] Ex. C) at 113. Later that same day, Saint-Gobain prepared and sent an invoice that included Saint-Gobain's general terms and conditions of sale. Id.; Jones Aff. [Docket No. 44] Ex. A.[1]

The mesh that Saint-Gobain sent to TEC had Saint-Gobain's "271 finish," which is a plasticized polyvinyl chloride ("PVC") coating. Jones Dep. at 86; 10/13/06 Parks Decl. Ex. J.

---

[1] At oral argument, counsel for Saint-Gobain stated that TEC sent multiple purchase orders and Saint-Gobain sent multiple shipments and invoices for mesh that was ultimately used at the Pepsi Center. Although the record contains a copy of Saint-Gobain's standard terms and conditions of sale, the only purchase order or invoice in the record is TEC's September 28, 1998 Purchase Order.

Saint-Gobain's 271 finish contained dioctyl phthalate ("DOP").  Newton Dep. (10/13/06 Parks

Decl. Ex. D) at 55-56.  Hereinafter, the mesh with the 271 finish will be referred to as the "271

mesh."  During all relevant times, Saint-Gobain also sold mesh that did not contain a DOP

plasticizer.  Jones Dep. at 45-46.  TEC was unaware that Saint-Gobain's 271 mesh contained a

DOP plasticizer.  Munce Dep. at 26.

**B.    Colorado Litigation and Settlement**

After its construction, portions of the Pepsi Center's lamina delaminated (debonded)

from the EPS board, necessitating repairs.  09/15/06 Parks Decl. Ex. 1 at 2-3.  After filing and

dismissing a federal court action in Colorado, Kroenke sued HOK and TEC in a Colorado state

court (the "Colorado litigation").  Id. at 2.  TEC filed a third-party complaint against Big Horn

and Saint-Gobain.  09/15/06 Parks Decl. Ex. 2 at 8-13.  The Colorado court dismissed Saint-

Gobain from the Colorado litigation based on a forum selection clause in TEC's purchase order

that specified Minnesota.  09/15/06 Parks Decl. Ex. 5.

Additionally, Mortenson filed a complaint in Colorado state court against HOK, Denver

Drywall, Big Horn, and TEC.  Mortenson subsequently dismissed the action, without prejudice,

after the parties executed a tolling agreement.  09/15/06 Parks Decl. Ex. 1 at 3.  Kroenke also

filed a demand for arbitration against Mortenson with the American Arbitration Association.  Id.

Subsequently, Kroenke, HOK, TEC, Mortenson, Denver Drywall, Big Horn, and

Travelers, as the liability insurer for Mortenson, Denver Drywall, and Big Horn, entered into a

Settlement Agreement and Release.  Under the Settlement Agreement, Kroenke released its

claims in exchange for $1.8 million from the other settling parties, allocated as follows: (1)

Travelers, as the insurer of Mortenson, Denver Drywall, and Big Horn, contributed $1.2 million;

(2) TEC contributed $400,000; and (3) HOK contributed $200,000.  Id. at 4, Ex. A.

Additionally, TEC assigned its claims against Saint-Gobain to Mortenson, Denver Drywall, Big

Horn, HOK, and Travelers.  Id. at 7.

## C.    Plaintiffs' Claims Against Saint-Gobain

On September 3, 2004, Travelers, as the subrogee of Mortenson, Denver Drywall, and

Big Horn, and HOK, on behalf of themselves and as the assignees of TEC's claims, filed suit in

Minnesota against Saint-Gobain, alleging that the mesh Saint-Gobain provided was defective

and caused the delamination of the Pepsi Center's EIFS.  Plaintiffs allege that the DOP and other

elements of Saint-Gobain's 271 plasticizer migrated and degraded the bond between the EPS

board and the base coat.  Plaintiffs assert the following claims for relief: (1) common law

indemnification; (2) contribution under Colorado statute; (3) contribution under Minnesota

statute; (4) breach of contract/warranty; (5) negligence; (6) breach of implied warranty of

merchantability under common law and/or Colorado statute; (7) breach of implied warranty of

merchantability under common law and/or Minnesota statute; (8) breach of implied warranty of

fitness for a particular purpose under common law and/or Colorado statute; (9) breach of implied

warranty of fitness for a particular purpose under Minnesota statute; and (10) contractual

indemnity.

## III. DISCUSSION

## A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      Plaintiffs' Motion for Partial Summary Judgment**

In their Motion for Partial Summary Judgment, Plaintiffs request the Court to find, as a matter of law that: (1) the indemnification clause in Section 14 and the express warranties in Section 4 of TEC's Purchase Order are part of the contract[2] between TEC and Saint-Gobain; (2) both Section 14 and Section 4 allow Plaintiffs to recover the $1.8 million paid to settle the Colorado litigation; and (3) Plaintiffs do not need to prove that Saint-Gobain was negligent or that Saint-Gobain's mesh was defectively designed or manufactured to trigger the indemnification clause in TEC's Purchase Order. TEC's indemnification clause states in part:

> 14. INDEMNIFICATION - Except to the extent that any injury or damage is due solely and directly to Buyer's negligence, Seller agrees to indemnify and hold harmless Buyer, its successors, assigns, customers and users of its products against all suits at law or in equity and from all damages, claims and liabilities arising out of . . . damage to any property, including damage to any article or goods in which Seller's goods are incorporated, alleged to have resulted from the goods or services hereby ordered, and upon the tendering of any suit or claim to Seller, to defend the same at Seller's expense as to all costs, losses, expenses, damages, claims, suits, or any liability whatsoever,

---

[2] Both Plaintiffs and Saint-Gobain agree that a contract was formed. However, they dispute the terms of the contract.

including attorney's fees.  The foregoing indemnification shall apply whether the . . .
damage is caused by the sole or concurrent negligence of Seller.

TEC Purchase Order at 2.  TEC's express warranties clause states in part:

4.  WARRANTIES - Seller warrants that all goods or services furnished hereunder will
conform to applicable specifications, instructions, drawings, data and samples, will be
merchantable, will be of good material and workmanship and free from defects, that the
goods or services will be fit and sufficient for the purpose intended, if such intent is
known to Seller . . . .  These warranties will be in addition to all other warranties,
expressed or implied, and will survive acceptance of and payment for any and all goods
or services ordered and will run to Buyer, its successors, assigns, customers and users of
its products.  Seller shall extend all warranties it receives from its vendors to Buyer, and
Seller's warranties shall extend to Buyer's customers.

Id.

In response to Plaintiffs' Motion, Saint-Gobain relies on the choice of law clause in

Section 17 of TEC's Purchase Order.  The clause specifies that "[t]he validity, interpret[ation],

and performance of these terms and conditions and all rights and obligations of the parties shall

be governed by the laws of the State of Minnesota."  Id.  Additionally, Section 6 of Saint-

Gobain's general terms and conditions of sale states in part:

The Company warrants only that all goods shall be of merchantable quality and in
accordance with specifications.  It will replace without charge f.o.b. point of destination,
Dominion of Canada, all goods shown to be otherwise than as warranted.  Liability is
limited to such replacement and the Company shall in no case be liable otherwise or for
indirect of [sic] consequential damages.

Jones. Aff. Ex. A.

Since Minnesota has adopted the Uniform Commercial Code ("UCC"), Saint-Gobain

argues that under Minn. Stat. § 336.2-207,[3] Sections 4 and 14 of TEC's Purchase Order directly

---

[3] Minn. Stat. § 336.2-207 states: "Conduct by parties which recognizes the existence of a
contract is sufficient to establish a contract although the writings of the contract do not otherwise
establish a contract.  In such cases the terms of the particular contract consist of those terms on
which the writings of the parties agree, together with any supplementary terms incorporated

conflict with the warranty clause in Saint-Gobain's invoice and therefore all three sections are "knocked out" of the contract between the parties.

**1.    Judicial Estoppel**

Plaintiffs first contend that Saint-Gobain is judicially estopped from asserting that Sections 4 and 14 of TEC's Purchase Order are not part of the contract between Saint-Gobain and TEC.  The Eighth Circuit in <u>Hossaini v. Western Missouri Medical Center</u>, 140 F.3d 1140, 1143 (8th Cir. 1998), held that judicial estoppel applies where "a party takes a position that is clearly inconsistent with its earlier position."  The <u>Hossaini</u> court did not decide whether judicial estoppel requires that the party's earlier position was accepted or relied upon by a court.  <u>Id.</u>

The thrust of TEC's judicial estoppel argument is Saint-Gobain's reliance on TEC's forum selection clause in obtaining dismissal from the Colorado litigation now precludes Saint-Gobain from arguing that other clauses in TEC's Purchase Order are not part of the contract.  In response, Saint-Gobain stresses that its Motion to Dismiss in the Colorado Litigation expressly stated that Saint-Gobain "specifically denies the validity of the indemnification and warranty provisions [of TEC's Purchase Order], and reserves all of its defenses and rights to challenge the validity and enforceability of the indemnification and warranty provisions."  09/15/06 Parks Decl. Ex. 3 at 4 n.2.  Further, Saint-Gobain argues that the Colorado court's Order granting Saint-Gobain's Motion to Dismiss did not address whether TEC's indemnity and express warranties provisions were part of the contract between TEC and Saint-Gobain.  <u>See</u> 09/15/06 Parks Decl. Ex. 5.

Because Saint-Gobain's stance in the Colorado litigation is not clearly inconsistent with

under any other provisions of this chapter."

its present stance, judicial estoppel does not apply against Saint-Gobain in this Minnesota

litigation.  In the Colorado litigation, Saint-Gobain expressly reserved the right to challenge the

validity and enforceability of TEC's indemnification and warranty provisions should litigation

be commenced in a Minnesota forum.  Plaintiffs are correct that this reservation of rights does

not literally encompass an argument that the disputed provisions are not part of the contract,

since a challenge to the validity and enforceability of terms of a contract is distinct from an

argument that those terms are not part of the contract.  See Chateau des Charmes Wines, Ltd. v.

Sabate USA, Inc., 328 F.3d 528, 530 (9th Cir. 2003) (recognizing that issues of contract

formation are antecedent to validity and enforceability issues).  However, Saint-Gobain's lack of

precision in its Motion to Dismiss in the Colorado litigation does not equate to Saint-Gobain's

asserting clearly inconsistent positions.

     To support their argument against this result, Plaintiffs cite Bonzel v. Pfizer, Inc., Civ.

No. 04-1401, 2004 WL 2475564 (D. Minn. 2004), where this Court found judicial estoppel

barred the plaintiff from asserting federal question jurisdiction based on patent claims.  In a

previous lawsuit, Bonzel had successfully defeated federal question jurisdiction by disclaiming

the existence of any patent issues.  Id. at *5.  Therefore, this Court held that judicial estoppel

barred Bonzel from asserting the patent issues in a subsequent related lawsuit between the same

parties.  Id.  In the instant case, any inconsistency in Saint-Gobain's positions does not rise to the

level of the clearly conflicting postures taken by Bonzel.  Moreover, there is no indication that

the Colorado court would have denied Saint-Gobain's Motion to Dismiss had Saint-Gobain

expressly reserved the right to contest whether TEC's indemnification and warranty provisions

were part of the contract.

2.      **The United Nations Convention on Contracts for the International Sale of Goods**

As an alternative ground for partial summary judgment, Plaintiffs assert that the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), reprinted in 15 U.S.C. App., governs contract formation issues in this case.  Plaintiffs argue application of the CISG leads to the conclusion that the indemnification and express warranties provisions of TEC's Purchase Order form a portion of the contract between TEC and Saint-Gobain.  Saint-Gobain counters that the choice of law provision in TEC's Purchase Order specifies that Minnesota law governs, and therefore the Minnesota UCC applies.

The Court finds, however, that the CISG applies in this case.  The CISG "applies to contracts of sale of goods between parties whose places of business are in different States . . . [w]hen the States are Contracting States."  CISG art. 1(1).  The CISG "governs only the formation of the contract of sale and the rights and obligations of the seller and the buyer arising from such a contract.  In particular . . . it is not concerned with . . . the validity of the contract or of any of its provisions or of any usage."  Id. art. 4(a).  "The parties may exclude the application of this Convention . . . ."  Id. art. 6.

The parties do not dispute that in October 1998, when TEC began to receive the allegedly defective 271 mesh from Saint-Gobain, TEC's place of business was in the United States and Saint-Gobain's place of business was in Canada.  See TEC Purchase Order at 1.  Since both Canada and the United States have ratified the CISG, it applies in this case unless the parties have excluded its application.  Saint-Gobain argues the parties have effectively done so, by specifying in TEC's Purchase Order that Minnesota law governs.  A majority of courts interpreting similar choice of law provisions, however, conclude that a reference to a particular

state's law does not constitute an opt out of the CISG; instead, the parties must expressly state

that the CISG does not apply.  See BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos, 332 F.3d 333,

337 (5th Cir. 2003); Am. Mint LLC v. GOSoftware, Inc., No. 1:05-CV-650, 2006 U.S. Dist.

LEXIS 1569, at *11-12 (D. Pa. Jan. 5, 2006); Ajax Tool Works, Inc. v. Can-Eng Mfg. Ltd., No.

01-C5938, 2003 U.S. Dist. LEXIS 1306, at *8 (D. Ill. Jan. 29, 2003); Asante Techs., Inc. v.

PMC-Sierra, Inc., 164 F. Supp. 2d 1142, 1150 (N.D. Cal. 2001).  But see Am. Biophysics Corp.

v. Dubois Marine Specialties, 411 F. Supp. 2d 61, 63 (D.R.I. 2006).  These courts reason that

even if a choice of law clause refers to the laws of a particular state, the state would be "bound

by the Supremacy Clause to the treaties of the United States."  Asante, 164 F. Supp. 2d at 1150,

citing U.S. Const. art. VI, cl. 2.  Accordingly, under the Supremacy Clause, the law in every state

is that "the CISG is applicable to contracts where the contracting parties are from different

countries that have adopted the CISG."  Id.  Thus, absent an express statement that the CISG

does not apply, merely referring to a particular state's law does not opt out of the CISG.  As the

Fifth Circuit stated, "[a]n affirmative opt-out requirement promotes uniformity and the

observance of good faith in international trade, two principles that guide interpretation of the

CISG."  BP Oil Int'l, 332 F.3d at 337, citing CISG art. 7(1).  The Court adopts the majority

position on applicability of the CISG.  Therefore, the CISG governs "the formation of the

contract of sale and the rights and obligations of the seller [Saint-Gobain] and the buyer [TEC]

arising from such a contract."  CISG art. 4(a).

Plaintiffs argue that under the CISG, the terms of the contract between TEC and Saint-

Gobain are the terms set forth in TEC's Purchase Order, including TEC's indemnity and

warranties clauses, because the CISG follows the last shot rule.  To derive the last shot rule from

the CISG's text, Plaintiffs cite Articles 18 and 19.  Article 18(3) states that:

> [I]f, by virtue of the offer or as a result of practices which the parties have established between themselves or of usage, the offeree may indicate assent by performing an act, such as one relating to the dispatch of the goods or payment of the price, without notice to the offeror, the acceptance is effective at the moment the act is performed . . . .

CISG Art. 18(3).  Article 19 embodies a mirror image rule: "[a] reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer."  CISG art. 19(1).  Such a reply may be an acceptance, however, if it "do[es] not materially alter the terms of the offer."  CISG art. 19(2).

Plaintiffs have adduced testimony that Saint-Gobain's practice in responding to an order was to first ship its goods and then, usually within a day, prepare and send its invoice.  See Jones Dep. at 113-14.  Plaintiffs argue that under CISG Article 18(3), Saint-Gobain accepted TEC's terms by shipping the mesh, and therefore conflicting terms in Saint-Gobain's invoices are without effect because the invoices were sent after Saint-Gobain performed.  Plaintiffs rely on In re Empire Pacific Industries, Inc., 71 B.R. 500, 503 (Bankr. D. Or. 1987), where a bankruptcy court held that invoices sent simultaneously or after goods were shipped could not be considered proposals for additions to a contract.  Other courts, however, have not imposed such a strict application of timing priority.  See, e.g., McJunkin Corp. v. Mechs., Inc., 888 F.2d 481, 487 (6th Cir. 1989) (holding that invoice sent within a few days of shipment was a written confirmation sent within a reasonable period of time).

This Court finds that material factual issues exist regarding formation of the parties' contract which preclude partial summary judgment for Plaintiffs.  The parties seem to assume that only their writings could have formed a contract; the CISG, however, explicitly states that "[a] contract of sale need not be concluded in or evidenced by writing and is not subject to any

other requirement as to form.  It may be proved by any means, including witnesses."  CISG art. 11.  Under the CISG, a proposal for concluding a contract is sufficiently definite to constitute an offer "if it indicates the goods and expressly or implicitly fixes or makes provision for determining the quantity and price."  CISG art. 14(1).  Thus, oral discussions between the parties agreeing to the goods, quantity, and price may have formed a contract before any purchase orders and invoices were exchanged.  See Chateau des Charmes, 328 F.3d at 531.  The record contains no evidence of discussions TEC and Saint-Gobain personnel may have had before TEC sent purchase orders, and the parties have not briefed whether an oral contract could have been formed.

Assuming arguendo that no oral discussions occurred, purchase orders and invoices were exchanged for each of TEC's mesh orders.  However, only TEC's September 1998 Purchase Order is in the record.  The lack of evidence in the record as to the timing of the exchange of the parties' forms prevents this Court from finding as a matter of law that the terms of TEC's purchase orders were part of a contract formed between TEC and Saint-Gobain.  See Coastal & Native Plant Specialties, Inc. v. Engineered Textile Prods., Inc., 139 F. Supp. 2d 1326, 1337 (N.D. Fla. 2001) (finding issue of fact where record did not indicate whether receipt of goods or receipt of invoice occurred first).

Given this holding, it is unnecessary at this time to address arguments regarding the interpretation of TEC's indemnification and express warranties clauses.  Such arguments will be properly addressed only if the Court determines that the clauses are part of the contract between TEC and Saint-Gobain.

**C.**    **Defendant's Motion for Summary Judgment**

    **1.**    **Arguments Specific to Plaintiffs' Claims under Colorado Law**

Saint-Gobain argues that Plaintiffs' claims based on Colorado law must be dismissed as a matter of law.  First, citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), Saint-Gobain suggests that Minnesota substantive law must govern Plaintiffs' claims since this is a diversity action.  It is well established, however, that in a diversity case a federal district court does not automatically apply the law of the forum state, but instead applies the choice-of-law rules of the forum state in determining what law to apply.  See Ferrell v. W. Bend Mut. Ins. Co., 393 F.3d 786, 794 (8th Cir. 2005).  Therefore, diversity jurisdiction does not compel the application of Minnesota law.

Saint-Gobain also argues that the choice of law clause in TEC's Purchase Order requires that Minnesota law governs all claims asserted in this case.  However, Plaintiffs correctly argue that the clause does not govern HOK's own claims, and the claims assigned to Travelers by Mortenson, Denver Drywall, and Big Horn, because only TEC and Saint-Gobain had a contractual relationship.  See Holden Farms, Inc. v. Hog Slat, Inc., 347 F.3d 1055, 1063-64 (8th Cir. 2003).  Plaintiffs assert that a Minnesota court applying the "significant contacts" test, see Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co., 604 N.W.2d 91, 93-94 (Minn. 2000), would apply Colorado law to those claims because the construction of and subsequent damage to the Pepsi Center occurred in Colorado.  Saint-Gobain has not briefed the application of the significant contacts test.

This Court finds that Colorado law applies to the contribution and UCC claims asserted by HOK and by Travelers, as the assignee of Mortenson, Denver Drywall, and Big Horn's

claims.  Therefore, neither <u>Erie</u> nor the choice of law clause in TEC's Purchase Order entitles Saint-Gobain to summary judgment on counts 2, 6, or 8 of the Complaint.

### 2.      Arguments Specific to Plaintiffs' Minnesota Contribution Claim

Saint-Gobain contends that under a literal reading of Minn. Stat. § 548.19, Plaintiffs' contribution claim under Minnesota law fails as a matter of law.  Section 548.19 provides a summary procedure whereby a joint debtor can continue a judgment in force for the purpose of compelling contribution.  Saint-Gobain contends that because no judgment was entered in the Colorado litigation, count 3 of the Complaint, labeled "Contribution - M.S.A. § 548.19," must be dismissed.

Plaintiffs do not contend they have satisfied the requirements for the summary procedure provided by Minn. Stat. § 548.19.  Nevertheless, Plaintiffs assert they have properly pled a claim for contribution under Minnesota law.  Plaintiffs cite as authority <u>Herubin v. Finn</u>, 603 N.W.2d 133 (Minn. Ct. App. 1999), where the court noted that "[a] joint debtor's inability to avail itself of the summary procedure provided in Minn. Stat. § 548.19 does not eliminate that joint debtor's ability to obtain contribution.  A joint debtor who pays more than its share of the joint debt may also initiate an action for contribution."  <u>Herubin</u>, 603 N.W.2d at 137 (citation omitted).

The Court is satisfied that Plaintiffs have adequately pled a contribution claim under Minnesota common law in count 3 of the Complaint.  Although Plaintiffs label their claim a statutory claim, the allegations in the Complaint sufficiently state a common law contribution claim.  <u>See</u> Compl. ¶¶ 38-47.  Moreover, paragraph 43 of the Complaint states that "[t]he purpose of releasing and extinguishing all claims Kroenke may have had was to preserve for Mortenson, HOK and TEC, all rights of contribution pursuant to state common and statutory

law." Id. ¶ 43.  This was sufficient to notify Saint-Gobain that Plaintiffs intended to pursue all statutory and/or common law contribution claims.  Therefore, the resolution of the Colorado litigation without entry of judgment does not entitle Saint-Gobain to summary judgment on count 3 of the Complaint.

### 3.    Implied Warranty of Fitness for a Particular Purpose

To establish breach of an implied warranty of fitness for a particular purpose, a plaintiff must prove that: (1) the seller had reason to know of the buyer's particular purpose; (2) the seller had reason to know the buyer was relying on the seller's skill or judgment to furnish suitable goods; (3) the buyer actually relied on the seller's skill or judgment.  Willmar Cookie Co. v. Pippin Pecan Co., 357 N.W.2d 111, 115 (Minn. Ct. App. 1984); Minn. Stat. § 336.2-315; cf. CISG art. 35(2)(b).[4]  Saint-Gobain argues for summary judgment on Plaintiffs' implied warranty of fitness for a particular purpose claims because: (1) Saint-Gobain had no knowledge that TEC ordered its mesh for use in the Pepsi Center EIFS; and (2) Saint-Gobain had no input in TEC's selection of mesh for the Ful-O-Mite EIFS or for the Pepsi Center EIFS.  Therefore, Saint-Gobain argues Plaintiffs cannot establish a breach of the implied warranty of fitness for a particular purpose.

In response, Plaintiffs argue there is sufficient evidence that TEC relied on Saint-Gobain

---

[4] Although Plaintiffs suggest that Colorado law applies to some of their claims, the parties cite almost exclusively to Minnesota law in addressing Saint-Gobain's Summary Judgment Motion.  The parties have not briefed whether application of the CISG to TEC's contract claims would differ from application of the Minnesota UCC.  However, "case-law interpreting analogous provisions of Article 2 of the Uniform Commercial Code . . . may also inform a court where the language of the relevant CISG provisions tracks that of the UCC." Delchi Carrier SpA v. Rotorex Corp., 71 F.3d 1024, 1028 (2d Cir. 1995).  Therefore, unless noted otherwise, Saint-Gobain's Motion is analyzed under the Minnesota UCC, as briefed by the parties.

to provide the proper mesh, and that Saint-Gobain had reason to know of TEC's reliance. Plaintiffs argue it is immaterial whether Saint-Gobain knew its mesh would be used in the Pespi Center EIFS, because Saint-Gobain knew TEC would use Saint-Gobain's mesh in an EIFS, and all EPS board and base coats are basically the same. Jones Dep. at 92, 94. Plaintiffs also cite testimony that in the early 1990s, Saint-Gobain helped TEC develop general technical specifications for using Saint-Gobain's mesh. Id. at 56-57. Plaintiffs further emphasize that Saint-Gobain notified TEC that the 271 mesh had "certain drawbacks," but that Saint-Gobain failed to disclose that its mesh included a chemical, DOP, that dissolves EPS board. Id. at 87, 91, 95-96; 10/13/06 Parks Decl. Ex. I.

This evidence, however, is insufficient for a jury to find that Saint-Gobain breached an implied warranty of fitness for a particular purpose. There is no evidence that Saint-Gobain had reason to know that its 271 mesh would be used for TEC's particular purpose—incorporation into the EIFS during the construction of the Pepsi Center. TEC's cited evidence shows only that Saint-Gobain had reason to know that its mesh would be used in an EIFS. This is a general purpose for the mesh. Saint-Gobain sold mesh both with and without the DOP plasticizer coating, and there is no evidence Saint-Gobain had reason to consider which would be appropriate for the given use. Because Plaintiffs' cited evidence does not support a finding that the implied warranty of fitness for a particular purpose was breached, summary judgment is granted to Saint-Gobain on counts 8 and 9 of Plaintiffs' Complaint.

**4.     Plaintiffs' Claims for Common Law and Contractual Indemnification, Contribution, Breach of Contract/Warranty, Negligence, and Breach of Implied Warranty of Merchantability**

Saint-Gobain moves for summary judgment on Plaintiffs' claims for common law and

contractual indemnification, contribution, breach of contract/warranty, negligence, and breach of implied warranty of merchantability.  Though recognizing that these are different claims, Saint-Gobain argues they share the requirement of proof of a defect in the 271 mesh.[5]  Saint-Gobain asserts that Plaintiffs' evidence of a design defect is insufficient as a matter of law.

As evidence of a design defect, Plaintiffs rely on expert testimony that the problems at the Pepsi Center were caused by "a defect related to the mesh product's composition, not the way it was installed."  Thomas Report (10/13/06 Parks Decl. Ex. L) at 1; see also Thomas Dep. (10/13/06 Parks Decl. Ex. K) at 45.  Additionally, Plaintiffs argue Saint-Gobain's 271 mesh was defective because Saint-Gobain manufactured reasonable alternative designs that did not pose the risks associated with DOP plasticizer.

Saint-Gobain responds that Plaintiffs' evidence is insufficient as a matter of law.  Saint-Gobain relies primarily on the Eighth Circuit's application of the raw materials/component product supplier defense in Temporomandibular Joint (TMJ) Implant Recipients v. E.I. Du Pont de Nemours & Company, 97 F.3d 1050 (8th Cir. 1996) ("TMJIR").  Under this doctrine, "suppliers of inherently safe component parts are not responsible for accidents that result when the parts are integrated into a larger system that the component part supplier did not design or build."  Id. at 1055 (quotation marks and citation omitted).  In applying the doctrine, the focus is on why the component part was unsuitable for use in the finished product:

'If the failure was due to a flaw in the component part, then the component part is itself defective and the cause for the assembled product being defective.' . . . If, on the other

_____

[5] The parties have also briefed issues concerning negligent failure to warn and negligent failure to test.  Given the Court's decision in Part III.E effectively affirming that Plaintiffs can not amend their Complaint to encompass these claims, these issues need not be addressed at this time.

hand, the finished product was unreasonably dangerous because the component part was unsuited for the particular use that the finished product manufacturer chose to make of it, then the defect is in the design of the finished product rather than in the design of the component part.

Id. at 1056, quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 100, at 705-06 (5th ed. 1984 & Supp. 1988).

In TMJIR, Vitek, Inc. manufactured implants used to correct disorders associated with the TMJ, which connects the upper and lower jaw. Id. at 1052. Vitek incorporated certain Teflon products created by Du Pont into the implants. Id. Du Pont warned Vitek, however, that its Teflon products were neither made nor tested for medical applications. Id. at 1053. After the implants failed, recipients sued Du Pont for defective design and failure to warn. Id. at 1052, 1054. The Court of Appeals affirmed summary judgment for Du Pont because there was no evidence that Du Pont's products were inherently dangerous, and Du Pont had no role in the design, testing, and manufacturing of the implants. Id. at 1058. In short, "the defect was in the design of the implant rather than in the design of the defendants' Teflon products." Id. at 1057.

Based on TMJIR, Saint-Gobain argues that Plaintiffs' evidence does not show that the 271 mesh was defective, but instead that the 271 mesh was incompatible as a component part of TEC's EIFS for the Pepsi Center. The Court finds, however, that Plaintiffs have offered sufficient evidence of a design defect to survive summary judgment. There is expert testimony that the presence of elements in the plasticizer that were antagonistic to EPS board was a design defect. Additionally, there is evidence that a reasonable alternative design was available that would have eliminated the known danger. Unlike in TMJIR, where Du Pont did not manufacture the Teflon products for use in medical applications, Saint-Gobain's 271 mesh was manufactured for use with EIFS. The presence in the mesh of chemicals antagonistic to EIFS prevents this

19

Court from finding as a matter of law that the 271 mesh was an inherently safe component part.

Thus, Plaintiffs have raised a genuine issue of fact concerning a design defect, and therefore

Saint-Gobain's Motion for Summary Judgment is denied on counts 1-7, and count 10 of the

Complaint.

**D.      Saint-Gobain's Motion to Strike**

Saint-Gobain moves to strike the "Supplemental Unsworn Declaration of John Cardinal

Parks in Opposition to Defendant Saint-Gobain Technical Fabrics Canada Limited's Motion for

Summary Judgment" [Docket No. 62] filed on October 26, 2006.  The Court has reviewed the

declaration and has determined that consideration of its contents does not affect the resolution of

Saint-Gobain's Motion for Summary Judgment.  Therefore, Saint-Gobain's Motion to Strike is

denied as moot.

**E.      Plaintiffs' Objections to the Magistrate Judge's Orders**

**1.      Standard of Review**

The standard of review for appeals of a magistrate judge's order on nondispositive

pretrial matters is extremely deferential.  The district court must affirm an order by a magistrate

judge unless it is  "clearly erroneous or contrary to law."  See D. Minn. LR 72.2; see also

Banbury v. Omnitrition Int'l Inc., 818 F. Supp. 276, 279 (D. Minn. 1993).  "A finding is 'clearly

erroneous' when, although there is evidence to support it, the reviewing court on the entire

evidence is left with the definite and firm conviction that a mistake has been committed."

Chakales v. Comm'r, 79 F.3d 726, 728 (8th Cir, 1996).

**2.      Objections**

Plaintiffs object to Magistrate Judge Arthur J. Boylan's October 16, 2006 Order

("October 16 Order") [Docket No. 51] denying Plaintiffs' October 2, 2006 Motion for Leave to

File Amended Complaint ("October 2 Motion") [Docket No. 31], and to Magistrate Judge

Boylan's November 15, 2006 Order ("November 15 Order") [Docket No. 87] denying Plaintiffs'

Motion for Extension of the Deadline for Motions Seeking Leave to Amend Pleadings

("November 3 Motion") [Docket No. 75].

Through both Motions, Plaintiffs sought to expand their negligence claim to assert that

Saint-Gobain negligently tested the 271 mesh, and that Saint-Gobain negligently failed to warn

TEC of the results of such testing.  Saint-Gobain objected to both motions.  Magistrate Judge

Boylan denied Plaintiffs' Motion for Leave to Amend because the Pretrial Scheduling Order's

[Docket No. 11] deadline for motions for leave to amend pleadings had passed on December 31,

2004, and because Plaintiffs had not moved for an extension of the deadline for filing such a

motion.  See Fed R. Civ. P. 16(b); In re Milk Prods. Antitrust Litig., 195 F.3d 430, 437-38 (8th

Cir. 1999) (distinguishing between situations where Rule 16 governs as opposed to Rule 15).

Alternatively, Magistrate Judge Boylan held that Plaintiffs had not shown good cause for such an

extension.  Plaintiffs argue that Magistrate Judge Boylan's orders extending some of the

deadlines in the Pretrial Scheduling Order also extended the deadline for filing motions seeking

leave to amend the Complaint, and thus Plaintiffs' October 2 Motion is timely.  Magistrate Judge

Boylan has stated adequate reasons why this argument is unavailing.  See November 15 Order.

Thus, this Court affirms the October 16 Order because of Plaintiffs' failure to first seek leave to

extend the deadline for such a motion.

Plaintiffs subsequently sought such leave in their November 3 Motion.  As one ground

for denying the November 3 Motion, Magistrate Judge Boylan held that Plaintiffs had not shown

21

good cause for the delay between May 18, 2006, when Plaintiffs assert they first became aware of the grounds for the new claims, and October 2, 2006, when Plaintiffs filed their Motion for Leave to Amend.[6]  Plaintiffs' stated reason for this delay is that their attention was diverted to a mediation session scheduled for August 2006, and then to their Motion for Partial Summary Judgment, filed on September 15, 2006.  The Court agrees with Magistrate Judge Boylan that Plaintiffs' decision to focus exclusively on those issues does not constitute good cause for the delay from May 18, 2006 to October 2, 2006.  Therefore, Magistrate Judge Boylan's November 15 Order is affirmed.

---

[6] Magistrate Judge Boylan assumed arguendo that Plaintiffs' November 3 Motion relates back to their October 2 Motion.

**IV. CONCLUSION**

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Defendant's Motion for Summary Judgment [Docket No. 20] is **GRANTED IN**

        **PART AND DENIED IN PART**;

2.      Plaintiffs' Motion for Partial Summary Judgment [Docket No. 25] is **DENIED**;

3.      Defendant's Motion to Strike [Docket No. 68] is **DENIED AS MOOT**;

4.      Plaintiffs' Objection to Magistrate Judge's Order on Motion for Leave to File

        Amended Complaint [Docket No. 64], construed as an appeal, is **DENIED**; and

5.      Plaintiffs' Objection to Magistrate Judge's Order on Motion for Extension of

        Deadline [Docket No. 88], construed as an appeal, is **DENIED**.


BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  January 31, 2007.